**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**In the Matter of the Search of**
**property described as,**                              **CASE NO: 21-mj-08170-TJJ**

**4909 W. 10th St.,**
**Great Bend, Kansas**                              **FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joshua D. Owenby, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.       I am a Special Agent of the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (hereinafter "HSI"), currently assigned to the Office of the Special Agent in Charge, Kansas City, Missouri and have been a federal officer for 11 years. During the course of my employment, I have participated in numerous investigations involving immigration offenses, identity theft, narcotics trafficking, firearms offenses, intellectual property and trademark infringement, which lead to the prosecution of suspects. I have attended various training academies, including the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training. I am a federal law enforcement officer as defined in Rule 41 of the Federal Rules of Criminal Procedure and I am authorized by federal law to request a search warrant.

**PURPOSE OF THE AFFIDAVIT**

2.       I present this affidavit in support of an application, pursuant to Federal Rules of Criminal Procedure Rule 41, for a warrant to search and seize relevant evidence in a property located within the District of Kansas. Based upon my investigation, I submit that the facts set forth in this affidavit establish that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of the unlawful activities described below, will be found within:

4909 W. 10th St., Great Bend, Kansas 67530 (the "SUBJECT PREMISES"). This location is known as the business address of Playa Azul. Playa Azul in Great Bend, KS is doing business under Playa Azul Inc. FEIN 20-3762169. Maria Esther Bravo is listed as President. Jose Luis Bravo ("BRAVO") is listed as Secretary.

## PROPERTY TO BE SEARCHED

The property known as PLAYA AZUL MEXICAN RESTAURANT & CANTINA (PLAYA AZUL), located at 4909 10th St, Great Bend, Kansas 67530 in Barton County, on the corner of 10th Street/Highway 156 and Eisenhower Avenue. To the east of PLAYA AZUL is "Aaron's" store. Eisenhower Avenue is west. Heartland Community Church is south, and "Mind Sculpt Games" is north (facing) PLAYA AZUL. In front of the building is a sign on an aqua blue colored pole that reads "PLAYA AZUL MEXICAN RESTAURANT & CANTINA".



## ITEMS TO BE SEIZED

A.      All documents, forms, information, and records relating to employment, including, but not limited to, Forms W-2, W-3, W-4, IRS Forms 941, DHS Forms I-9, other employment tax documents; ledgers and records related to the hiring and/or firing of workers, work permits and/or authorizations for Playa Azul to include corresponding information transmitted to Specialty Foods and Entel Solutions.

B.      Financial and banking records that may show payments consistent with employment or wages for Playa Azul to include paper and electronic financial records, statements, applications, cards, wire transfers, receipts and/or records concerning other financial transactions and accounts.

C.      Documents, forms, and records relating to employees' identity and/or alienage and immigration status, including, but not limited to, copies or originals of passports, visas, birth

certificates, certificates of naturalization, permanent resident alien cards, work authorizations and correspondence relating to Social Security Administration.

      D.     Copies of time sheets, login logout employee history documents, work schedules, and employee housing arrangements.

      E.     Computer equipment and computer storage devices identified which are used for employee record keeping and record keeping of enterprise restaurants that pertain to employee payroll, employment hiring records, employee identification documents, Time & Attendance, and scheduling.

      F.     Correspondence between Specialty Foods, Intel Solutions and/or Entel Solutions, and other Bravo affiliated restaurants pertaining to staffing, scheduling, onboarding of new employees, financial transactions, rent payments, and other business communications.

      G.     Records pertaining to the creation of the business located at the "the premises" to include ownership structure, regulatory filings, and documents essential in daily operations of the business.

      3.     This affidavit is based upon information I have gained through investigation, training and experience, as well as information from other federal law enforcement officers, local and/or state law enforcement officers and cooperating individuals, all of whom I believe to be reliable. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that violations of Title 8, United States Code, Section 1324(a)(1)(A)(iii), (concealing or harboring aliens); Title 8, United States Code, Section 1324a(1) (unlawful employment of aliens); Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (conspiring to transport, harbor and encourage illegal aliens to reside in the United States); Title 18, United States Code, Section 1962(d) (RICO Conspiracy); and Title 18, United States Code, Section 1956(h)(conspiracy to launder money) have been committed. I further believe there is probable cause to believe that evidence, fruits, and instrumentalities will be found at SUBJECT PREMISES.

## CASE SUMMARY AND BACKGROUND OF INVESTIGATION

      4.     On August 11, 2021, a grand jury in the Western District of Missouri returned a sealed indictment charging 17 defendants, including JOSE LUIS BRAVO, ANTHONY EDWARD DOLL, MIGUEL TARIN-MARTINEZ, and ANTONIO MARTINEZ-MUNOZ, with conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d).  The indictment also charged three counts of use of unlawfully obtained documents, in violation of 18 U.S.C. § 1546(a); three counts of false attestation, in violation of 18 U.S.C. § 1546(b)(3); three counts of false representation of a Social Security number, in violation of 42 U.S.C. § 408(a)(7)(B); one count of conspiracy to commit identification document fraud, in violation of 18 U.S.C. § 1028(f); two counts of unlawful production and transfer of identification documents, in violation of 18 U.S.C. §§ 1028(A)(1), 1028 (A)(2) and

1028(b)(1)(A)(i); one count of conspiracy to transport illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(A)(v)(I); ten counts of transportation of illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i); 33 counts of hiring and employing illegal aliens, in violation 8 U.S.C. § 1324a(a) and (f)(1); one count of conspiracy to money laundering, in violation 18 U.S.C. § 1956(h); and six counts of money laundering, in violation of 18 U.S.C. § 1957.

5.       In June 2018, HSI Kansas City and Kansas Department of Labor (DOL) initiated an investigation into the criminal enterprise of BRAVO.  The investigation that followed determined the enterprise consisted of a web of more than 31 Limited Liability Corporations (LLC) created to oversee 45 Mexican restaurants in multiple states and at least an additional 11 LLCs were involved in restaurant supply and logistics, real estate, and construction. This investigation has shown that BRAVO's enterprise consistently gained an unfair business advantage by employing unauthorized workers within their business entities in violation of Untied States law.

6.       Specialty Foods Distribution Inc (SFD) is a wholesale distributor. The corporation distributes food, restaurant supplies and equipment to a wide variety of restaurants related and unrelated to this investigation. SFD delivers those same products via trucking to their clients. The restaurants under the command and control of BRAVO and his co-conspirators maintain responsibility of the day-to-day operations while SFD conducts administrative business tasks for the restaurants such as payroll, bookkeeping, insurance, official registration, licensing, taxes, and legal support. BRAVO who is also listed as President of SFD, has financial interest in many of the restaurants serviced by SFD and therefore has a stake in its workforce management and profit potential

7.       Intel Solutions, LLC (which later changed its name to Entel Solutions, LLC) was created by BRAVO and SFD's upper management in August of 2019 to provide a layer to shield SFD from criminal liability associated to the widespread unlawful employment practice of hiring unauthorized alien workers. Via a Title III Intercept, HSI Kansas City intercepted a call between Miguel TARIN-Martinez and BRAVO, which consisted of TARIN assuring BRAVO that Intel Solutions, LLC was created to give the appearance that payroll and bookkeeping were not being handled in-house at Specialty Foods Distribution, Inc, but was the responsibility of an unrelated outside business entity, Intel Solutions. Other intercepted conversations reveal Anthony DOLL created Intel Solutions and registered the corporation to his wife, Kaman "Erica" DOLL.

8.       During the investigation, special agents have identified personnel heavily involved in the day-to-day operations of SFD. BRAVO as the primary owner and officer for SFD, is the leader of the enterprise and controls the money and subordinate companies. JOSE GUADALUPE RAZO (RAZO) is also listed as a president of SFD in open-source documents. DOLL is the chief financial officer and primary bookkeeper of SFD. MIGUEL TARIN-MARTINEZ (TARIN) is the controller of SFD. ANTONIO MARTINEZ-MUNOZ (MARTINEZ) is a sales manager of SFD.

## FACTUAL BASIS

9.     Throughout the course of the investigation into SFD and BRAVO affiliated businesses, investigators have discovered approximately 45 restaurants generating criminal proceeds by utilizing unauthorized employees as a significant source of labor. Without the existence of this availability of labor, BRAVO's restaurant entities would not have been able to generate the same level of profitability, or in some cases, remain open at all.

10.    BRAVO, who has financial interest in most of the approximately 45 locations identified, is involved in operational aspects of these restaurants as often he provides retail space, food supply, payroll and taxes by way of Entel Solutions. He additionally aids in staffing and placement of individuals known to be unauthorized for employment. These unauthorized employees are sourced from a labor pool not utilized by businesses complying with hiring laws, giving BRAVO and his restaurants an unfair competitive advantage over competition.

11.    Following the execution of a federal search warrant of Bravos Mexican Grill in Overland Park, Kansas on February 28, 2019, HSI served 10 Notices of Inspection on June 7, 2019 at restaurants associated with JOSE LUIS BRAVO and co-conspirators including ANTHONY EDWARD DOLL, JOSE LUIS LOPEZ-VALADEZ, OSCAR MOLINA ANGULO, EUSEBIO RAMIREZ CEJA and RODRIGO RAZO in Missouri, Kansas, and Oklahoma. Those restaurants operated under LLCs, doing business as El Charro (Claremore, Oklahoma; Butler, Missouri; and Springfield, Missouri), Playa Azul (Great Bend, Kansas; Pratt, Kansas; and Wichita, Kansas), Iguana Azul (Nevada, Missouri), Los Sauces (Nevada, Missouri), and La Paloma (Springfield, Missouri). These restaurants were also served with Notices of Suspect Documents and all of the restaurantswere found to have employed unauthorized workers. Approximately 68% of all the employees audited at the restaurants were not authorized to work in the United States. In addition to Bravos Mexican Grill in Overland Park, Kansas, 4 of the 10 locations subject to the June 7, 2019 I-9 Inspection closed.

12.    On February 21, 2020, administrative subpoena was served to the Kansas State Liquor Board, ABC in regard to the 'License File' submitted by restaurants involved in this investigation. Information was returned for Playa Azul, located at 4909 W. 10th St., Great Bend, KS 67530.  Documentation received from ABC listed the notable positions for Playa Azul as Maria Esther Bravo, President, Veronica Melendez, VP, Jose Luis Bravo, Secretary, Rodrigo M. Razo, Power of Attorney, Miguel Tarin, Contact Person, Chris Shawn O'Hara, Resident Agent / Attorney, and Wyatt L. Adams, CPA.

13.    On November 17, 2006, Bravo LLC purchased the commercial property located at 4909 10th Street, Great Bend, Kansas for $330,000 from HOBB Partners V, LLC.  The purchase was made via an unknown payment method as the title company had limited documentation.  The property is currently paid off and has no outstanding mortgages but there is a reported tax lien of approximately $27,217 for unpaid taxes. This location is currently and has operated in the past as Playa Azul Mexican Restaurant and Cantina. From approximately January 1, 2018 to September 30, 2020, the Playa Azul in Great Bend, Kansas made approximately $4,071,874.52 USD in gross receipts.

14.     Between February 10, 2014 and September 30, 2020, this restaurant location has made 45 payments totaling $466,600 derived from proceeds from its operating account (Bank of the West account number ending in 9611) to BRAVO's personal account (Grand Bank account number ending in 6892). These payments consist of 32 checks, totaling approximately $218,600.00, that were notated as rent or were consistent with rent payment amounts. The remaining 13 checks, totaling approximately $248,000.00, contained no notation in the memo line.

15.     On June 7, 2019, HSI Wichita Special Agents traveled to Great Bend, Kansas to serve a Notice of Inspection (NOI) to management of the PLAYA AZUL restaurant, located at 4909 10th St. in Great Bend, Kansas. Rodrigo MANIRIQUE-Razo was encountered and claimed that he was the manager of that location, so he was served the NOI. MANRIQUE stated that he had been the manager since 2003 and prior to that he worked in Idaho. MANRIQUE stated there were approximately 20 employees at this location of Playa Azul. MANRIQUE identified the restaurant's accountant as "Specialty Foods" Tony DOLL. MANRIQUE provided Doll's phone number as well as his email address to special agents as points of contact.

16.     A review was conducted on the Forms I-9 provided by Playa Azul and special agents determined that 13 of 21 employees were unauthorized for employment based on documentation provided by Playa Azul.  A Notice of Suspect Documents letter was issued informing the restaurant of individuals whose documentation did not appear to match their identity. In addition, the restaurant was provided a list of corrections needed for Forms I-9 completed incorrectly. On August 9, 2019, an attorney for PLAYA AZUL sent  corrected Forms I-9.

17.     On August 14, 2019, the attorney for Playa Azul sent a response to the Notice of Suspect Documents. According to the response, the following employees either terminated their employment prior to August 13, 2019, or chose not to provide further documentation of their right to employment in the United States and were terminated: Guillermina Cuellar, Juan Luna, Martha Razo, Ricardo Taboada, David Villalpando, Gilberto Rayas, Juan Carlos Hernandez, Rosa Sanchez Navarro, Juan Perez Gonzalez, Wendy Aguilar, Jose Botello, Luis Cortes Garcia, and Adrian Botello Ochoa. This list contained all the names listed on the Notice of Suspect Documents.

18.     After August 14, 2019, Playa Azul Inc, continued to employ Ricardo Taboada, an unauthorized employee, at Playa Azul when he should have been terminated on or before August 13, 2019. Through a subpoena for a Playa Azul account with Bank of the West, investigators identified a payroll check issued to Ricardo Taboada in the amount of $1,281.25. The memo line referenced the pay period as 08/12/2019-08/25/2019.

19.     As part of this investigation, agents obtained a court-authorized wiretap for wire and electronic communications on a wireless telephone belonging to Jose RAZO.  On September 16, 2019, pursuant to the court authorized  wire and electronic intercept, a telephone call was intercepted between Jose RAZO, president of SFD, and Rodrigo MANRIQUE RAZO, manager of Playa Azul in Great Bend, Kansas. During the call, the two discuss the audit of Playa Azul in Great Bend, Kansas. During the call MANRIQUE and RAZO discuss the continued hiring of Ricardo Taboada (also known in this investigation as Mr. Richard/Ricardo) after Playa Azul stated he was terminated on or before August 13, 2019. MANRIQUE tells RAZO that the payroll at Playa Azul is too high because of what he is paying Taboada.

> **MANRIQUE**: The payroll, I'm working on because is fifty-two-hundred dollars [5,200] high a month. That's a lot of money. But that's from the first [1st] one, because I was giving one-thousand-six hundred [1,600] to mister Ricardo. And I was going to talk to him earlier, but I didn't want to lower it down for him until the first two [2] or three [3] weeks had passed which were to going to be chaotic, and I said, "He is not going to leave."

20.     Later in the conversation, MANRIQUE tells RAZO he told Richard Taboada to teach other employees how to make sauces, however Taboada declined out of fear of being fired.

> **MANRIQUE**: And I told her, "That's not the problem, the problem is that you don't have people like for Karen." Since I'm already giving one [1] day to Karen, now I can give her one and a half [1.5] day to Karen too, with the new guys that I started with. The only thing is the problem in the kitchen. And, if I tell mister Richard, "Start teaching him how to make the sauces." He is going to say, "No, now you are going to fire me, dude" [LAUGHS]. Do you understand?"

21.     Through a subpoena for a Playa Azul account with Bank of the West, investigators identified a handwritten check issued to Guillermina Cuellar in the amount of $656.00 on July 23, 2020. Guillermina Cuellar had been previously identified as an unauthorized employee at Playa Azul and according to their attorneys had been terminated on or before August 13, 2019.

22.     Through a subpoena for a Playa Azul account with Bank of the West, investigators identified a handwritten check issued to Jorge Martinez in the amount of $2,000 on September 15, 2020. Jorge Martinez did not appear in the audit of forms I-9 for Playa Azul in Great Bend, Kanas, however he was identified at another Playa Azul location in Wichita, Kansas. During an I-9 investigation conducted at Playa Azul in Wichita, Kansas, he was identified as unauthorized for employment. Jorge Martinez did not challenge the findings and was required to be terminated on or before August 13, 2019.

23.     On August 2, 2019, pursuant to a court authorized TIII wire and electronic intercept, a telephone call was intercepted between Jose RAZO, president of SFD, and Rodrigo MANRIQUE RAZO, manager of Playa Azul in Great Bend, Kansas. During the call, the two discussed the audit of Playa Azul in Great Bend, Kansas.

> **MANRIQUE**: Guess who was saved?
> **RAZO**: Who?
> **MANRIQUE**: Your nice Karen Villalpando.
> **RAZO**: Uh-huh. Did you have her there or not?
> **MANRIQUE**: No, [CHUCKLES] I never added her to the payroll.
> **RAZO**: Yes, I know.
> **MANRIQUE**: So, I'm only going to have three waiters, Alfredo, Carol, and Karen, that's all. Everyone else is going out.

24.     Through training and experience, investigators know that a tactic often utilized in concealing an unauthorized employee from detection is to keep them off official state wage and hour reports and not having the employee fill out a Form I-9. The I-9 inspection conducted at Playa Azul in Great Bend, Kansas returned no employment records for Karen Villalpando. In addition, a search of wage and hour reports provided by the state of Kansas also shows no wages earned by this employee. Through training and experience, investigators know that while these employees may not show on official filings, many times these restaurants will keep records in the form of payment ledgers or on shift schedules.

25.     During the conversation between RAZO and MANRIQUE, RAZO instructed MANRIQUE to add the individuals with valid employment documents to the "payroll," meaning to fill out official employment documents required by the state of Kansas. The conversation again turned to Karen Villalpando who has also been working at Maria's Mexican Grill in Great Bend for MANRIQUE RAZO's sister Veronica LARA as well.

> **MANRIQUE**: Yeah, I can also add Karen, right?
> **RAZO**: Well, I don't know if they have her at Maria's.
> **MANRIQUE**: No, she is not registered at Maria's either.
> **RAZO**: No?
> **MANRIQUE**: Ah-ah. She was never registered over there.

26.     During an I-9 inspection conducted at Marias in Great Bend, Kansas, an analysis of the subpoenaed documentation determined no employment records existed for Karen Villalpando. In addition, a search of wage and hour reports provided by the state of Kansas also shows no wages earned by this employee.

27.     The conversation between RAZO and MANRIQUE concluded with RAZO indicating that future staffing decisions should be agreed upon by Jose BRAVO, who is listed as secretary of Playa AZUL from that location.

> **RAZO**: So, you just have to get into an agreement with Jose Luis.
> **MANRIQUE**: Yeah.
> **RAZO**: Because he didn't tell us what he was going to do, so, you just need to get into an agreement with him.
> **MANRIQUE**: Okay.
> **RAZO**: Because, he is interested in saving Playa's, believe it or not.
> **MANRIQUE**: Why?
> **RAZO**: Because he owns that location [LAUGHS]
> **MANRIQUE**: Oh.
> **RAZO**: But not Maria's.
> **MANRIQUE**: Mm-hmm. Well, let's see what he says. I'm still going to wait for him to call me.

28.     On October 27, 2019, a call between RAZO and MANRIQUE was intercepted that involved the discussion of staffing at restaurant operations in Great Bend, Kansas. In this intercepted call, RAZO told MANRIQUE that Ramon MORENO-Hernandez will be transporting

five workers to Great Bend, Kansas. RAZO stated two of these workers will be from Union de San Antonio, Mexico and they are both named Jorge. RAZO then instructed MANRIQUE to have these workers fill out all required documents and if one is missing documents, he will need to help them in securing some. RAZO knows these two workers are from Mexico, and if they don't provide the necessary documents to show authorization to work in the United States directs MANRIQUE to help them secure fraudulent documents.

29.     On October 28, 2019, while travelling to Great Bend, Kansas, Ramon Moreno-Hernandez was stopped by Kansas Highway Patrol for a traffic violation. HSI Kansas City learned the front seat passenger presented a Mexican passport in the name Jorge Moreno-Ramirez. HSI Kansas City conducted a database query on Moreno-Ramirez and found he last entered the United States as a (H2A) nonimmigrant temporary worker who has overstayed his authorized period of admission. Investigators conclude this was one of the two workers named Jorge as discussed in his conversation with MANRIQUE. The vehicle was surveilled to Great Bend, Kansas and both Moreno's entered Playa Azul, Great Bend Kansas. Both Ramon Moreno and Jorge Moreno unloaded luggage into a Chevy Silverado. Jorge Moreno was driven to a residence by an unknown male. A Chevy Silverado registered to Rodrigo Razo arrives at the residence and a subject appearing to be Rodrigo MANRIQUE-Razo entered the residence. Jorge Moreno retrieved luggage from the Chevy Silverado.

30.     On October 2, 2020, Jorge Moreno-Ramirez was interviewed by HSI Seattle. Moreno-Ramirez stated he was placed at various restaurants in Missouri and Kansas by Ramon MORENO. Jorge Moreno-Ramirez stated he worked at Playa Azul, in Wichita, Kansas and Cantina Bravo, in Joplin, Missouri and an unknown city in Kansas. Jorge Moreno stated he was paid by check.

31.     From approximately January 1, 2018 to September 30, 2020, the Playa Azul in Great Bend, Kansas (i.e., the SUBJECT PREMISES) made approximately $4,071,874.52 USD in gross receipts that was deposited into their operating account identified as Bank of the West account (account number ending in 9611). During that same time, the account number ending in 9611 sent approximately $1,782,841.24 USD to Specialty Foods Distribution and approximately $116,168.94 USD to Intel Solutions, also known as Entel Solutions, including weekly and monthly payments. Additionally, analysis shows the account number ending in 9611 sends a semifrequent monthly rent check to Jose BRAVO averaging between $5,4000.00 and $5,500.00. The account number ending in 9611 also conducted approximately seven significant transfers to BRAVO, totaling approximately $158,000.00. The account number ending in 9611 conducted three additional transfers to Bravo LLC, which is owned by BRAVO, totaling approximately $56,000.00.

## BUSINESS RECORDS

32.     Based upon my training and experience, I know that it is a common practice for business owners to keep records documenting finances, bank statements, ownership, membership and custody of entities they have a financial interest in. These records can be official records or documented in a ledger in the form of notes or other informal manner in both paper and electronic formats. These documents are typically in secure locations within their residences,

their vehicles, their business, or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities. Records are commonly retained by individuals for multiple years for the purpose of reference in matters such as such as depreciation, amortization, depletion deduction, to figure the gain or loss when property is sold or otherwise disposed of.  The Internal Revenue Service (IRS) recommends keeping tax documents for a period ranging from three years to an indefinite amount of time.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33.     As described above, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following:

a.     Based on my training and experience and the training and experience of those with whom I have consulted, I am familiar with the following terms:

i.     *Server:* A server is a computer that provides services to other computers. Examples include web servers which provide content to web browsers and e-mail servers which act as a post office to send and receive e-mail messages.

ii.     *Server Hosting Provider:* A Server Hosting Provider, commonly referred to as a Data Center, is a commercial organization that is in the business of providing a 1·ange of functions associated with the operation of computer servers. Server Hosting Providers typically offer services such as renting servers for use by customers, providing a location to house customer-owned servers, and providing internet connectivity for servers located at the Server Hosting Provider's facility so that those servers are accessible via the Internet. I know that customers of server hosting providers may place files~ software code, databases, and other data on the servers. To do this, customers connect from their own computers to the server computers across the Internet.

b.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap' or "recovery" file.

d.      Wholly apart from user-generated files, computer storage media- in particular, computers' internal hard drives contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

e.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or cache.

35.      *Forensic evidence*. As further described above, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, sp1'ware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy," while executing a search warrant at a residence.

The existence or absence of anti-virus, sp1.ware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image f1les, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user- Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.      *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule a1(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

38. Playa Azul restaurant is presently a functioning business. The seizure of the company's computers may limit the company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where

appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## **CONCLUSION**

39.     Based on the above information, it is requested a search warrant be issued to me or any other officer that I deem necessary to search the SUBJECT PREMISES described above for information contained in which is the business address of SFD for property and evidence believed to be at the address as listed below.

40.     This affidavit seeks authority to enter the SUBJECT PREMISES and to search for and seize fruits, evidence, and/or instrumentalities of the specified federal offenses. More particularly, there is probable cause to believe that the premises, at the time of the execution of the search warrant there will be the items, materials, and objects described in Attachment B to the search warrant for the premises. Additional authority is sought to execute the warrant at any time of day as law enforcement deems necessary.

41.     I further request that this affidavit be sealed.  The affidavit discusses an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal the affidavit because its premature disclosure may seriously jeopardize this ongoing investigation, allow for destruction of evidence, and the flight of other targets.

42.     Additionally, it is requested that the affidavit be allowed to be disclosed as necessary for any discovery in criminal prosecutions without the need for an Order unsealing it.

Respectfully submitted,

Joshua Owenby
Special Agent
U.S. Department of Homeland Security,
Homeland Security Investigations

Subscribed and sworn to before me on _____August 23_____, 2021 after having first been submitted to me by reliable electronic means.

Hon. Teresa J. James

United States Magistrate Judge
District of Kansas